J-S34029-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: H.E.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.P.M., FATHER | : | No. 241 WDA 2018 |

Appeal from the Decree January 24, 2018
In the Court of Common Pleas of Blair County
Civil Division at No:  2017 AD 52

BEFORE:   BOWES, J., STABILE, J., and STRASSBURGER, J.*

MEMORANDUM BY STABILE, J.:                   **FILED SEPTEMBER 18, 2018**

S.P.M. ("Father") appeals from the decree entered January 24, 2018 in the Court of Common Pleas of Blair County that involuntarily terminated his parental rights to his daughter, H.E.M. ("Child"), born in November 2016.[1] After careful review, we affirm.

Blair County Children, Youth and Families ("CYF") became involved with Child due to an incident of domestic violence that occurred less than a week after her birth.  Specifically, Mother alleged that Father struck her while she was holding Child.  Mother filed a protection from abuse ("PFA") petition, but later withdrew it, prompting CYF to seek emergency custody.  The trial court granted emergency custody on December 8, 2016.  The court entered a

---

* Retired Senior Judge assigned to the Superior Court.

[1] The decree also terminated the parental rights of R.E.B. ("Mother").  Mother filed her appeal at Superior Court docket number 282 WDA 2018.  We address her appeal in a separate memorandum.

shelter care order on December 15, 2016 and adjudicated Child dependent by order entered December 28, 2016.

On December 12, 2017, CYF filed a petition to terminate Father's parental rights to Child involuntarily. The trial court conducted a termination hearing on January 23, 2018.[2] The following day, the court entered a decree terminating Father's parental rights. Father timely filed a notice of appeal on February 14, 2018, along with a concise statement of errors complained of on appeal.

Father now raises the following claims for our review.

I. Whether the [trial c]ourt erred and abused its discretion by terminating the rights of [Father], despite clear evidence that [Father] corrected several outstanding issues outlined by [CYF], and substantial progress was made towards the correction of the remaining issues[?]

II. Whether the [trial c]ourt erred and abused its discretion by failing to consider the bond that exists between [Father] and his daughter, [Child], and the effect that the termination of that bond would have on [Child?]

Father's Brief at 5.

We consider Father's claims mindful of the following standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate

___

[2] During the hearing, Child had the benefit of a guardian *ad litem* ("GAL"). The trial court concluded that the GAL could represent both Child's legal and best interests, given that Child was just over a year old. N.T., 1/23/18, at 45. We note that Child's GAL did not submit her own appellate brief but did send this Court a letter joining the arguments contained in CYF's brief.

courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the trial court terminated Father's parental rights pursuant to Section 2511(a)(2), (5), (8), and (b). In order to affirm, we need to agree with the court as to only one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's

decision to terminate pursuant to Section 2511(a)(2) and (b), which provide

as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may
> be terminated after a petition filed on any of the following
> grounds:
>
> ***
>
> > (2) The repeated and continued incapacity, abuse,
> > neglect or refusal of the parent has caused the child
> > to be without essential parental care, control or
> > subsistence necessary for his physical or mental well-
> > being and the conditions and causes of the incapacity,
> > abuse, neglect or refusal cannot or will not be
> > remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights
> of a parent shall give primary consideration to the developmental,
> physical and emotional needs and welfare of the child.  The rights
> of a parent shall not be terminated solely on the basis of
> environmental factors such as inadequate housing, furnishings,
> income, clothing and medical care if found to be beyond the
> control of the parent.  With respect to any petition filed pursuant
> to subsection (a)(1), (6) or (8), the court shall not consider any
> efforts by the parent to remedy the conditions described therein
> which are first initiated subsequent to the giving of notice of the
> filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We begin by considering whether the trial court abused its discretion by

terminating Father's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A.
> § 2511(a)(2), the following three elements must be met: (1)
> repeated and continued incapacity, abuse, neglect or refusal; (2)
> such incapacity, abuse, neglect or refusal has caused the child to
> be without essential parental care, control or subsistence
> necessary for his physical or mental well-being; and (3) the

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted).  "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.  To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties."  *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In its opinion, the trial court concluded that CYF presented clear and convincing evidence to terminate Father's parental rights involuntarily.  Trial Court Opinion, 3/7/18, at 22.  The court reviewed the history of this case and the relevant evidence at length.  *Id.* at 6-21.  The court reasoned that Father failed to cooperate with services and did not demonstrate desire or consistent effort to remedy the conditions resulting in Child's placement in foster care. *Id.* at 22.

Father contends that CYF failed to meet its burden of proof.  Father's Brief at 8-15.  Father maintains that he is making substantial progress toward completing services by attending an intensive outpatient treatment program addressing substance abuse and mental health issues.  *Id.* at 12-13.  Father also maintains that he has shared custody of his three other children, which proves that he can care for Child.  *Id.* at 13-14.

Our review of the record reveals the following.  After Child's placement in foster care and adjudication of dependency in December 2016, the trial court ordered Father to comply with a series of reunification goals.  These

goals included 1) cooperating with Family Intervention Crisis Services ("FICS"); 2) undergoing a psychological evaluation; 3) participating in the Men Helping Men domestic violence program; and 4) continuing counseling with his psychologist. Order of Adjudication and Disposition, 12/28/16, at 5.

Initially, Father made substantial progress toward completing his goals. Father complied with FICS reunification services, including supervised visits. Permanency Review Order, 5/4/17, at 8. He completed the Men Helping Men program. Permanency Review Order, 6/21/17, at 8. He also participated in an evaluation with psychologist, Terry O'Hara, Ph.D. Among other things, Dr. O'Hara recommended that Father participate in drug screens and an intensive outpatient treatment program aimed at addressing substance abuse, anger management, aggression, and emotional regulation concerns. Psychological Evaluation Report, 4/27/17, at 29.

Father's progress deteriorated during the second half of 2017. Mother filed PFA petitions against Father in June 2017 and August 2017. Permanency Review Order, 6/21/17, at 8; Permanency Review Order, 11/8/17, at 8-9.[3] Mother later withdrew the June 2017 petition but obtained a final PFA order with respect to the August 2017 petition. Permanency Review Order, 11/8/17, at 9. Despite this order, Father resumed living with Mother, and another

---

[3] In its permanency review order entered November 8, 2017, the trial court changed Child's permanent placement goal to adoption.

incident of domestic violence occurred in December 2017.[4] Permanency Review Order, 12/19/17, at 2. Father also failed to attend four intensive outpatient treatment sessions and admitted to continued marijuana use. *Id.* at 3. Father missed two of his meetings with FICS reunification services, which then discharged him unsuccessfully. *Id.*

Dr. O'Hara reevaluated Father in October 2017 and found no evidence that he would be able to provide appropriate care for Child within a reasonable time. Psychological Evaluation Report, 11/8/17, at 17. He observed that Father tested positive for opiates and marijuana in August 2017 and refused a drug screen later that same month. *Id.* at 14. Father's intensive outpatient treatment program discharged him unsuccessfully and he declined to attend further substance abuse treatment. *Id.* Moreover, Father was inconsistent in attending counseling with his psychologist. *Id.* Dr. O'Hara warned that Father posed a high risk for future violence. *Id.* at 17.

Father remained noncompliant at the time of the termination hearing. Father resumed attending his intensive outpatient treatment program but his drug screens continued to produce positive results.[5] N.T., 1/23/18, at 10-11. Father testified that he was still failing to attend his counseling appointments

---

[4] Father faced a series of criminal charges stemming from the December 2017 incident. Permanency Review Order, 12/19/17, at 2. The charges were later withdrawn after Mother began dating the police officer who filed them. N.T., 1/23/18, at 31-32.

[5] Father's drug screen levels were "consistently dropping." N.T., 1/23/18, at 11.

"[b]ecause of transportation." *Id.* at 38. Father's volatile relationship with Mother also remained a concern. Father filed a PFA petition against Mother alleging that she threatened his life. *Id.* at 12, 25. Ominously, Mother had moved into a new home that was approximately one block away from Father's home. *Id.* at 7.

Thus, the record supports the trial court's findings pursuant to Section 2511(a)(2). While Father made initial progress toward completing services, he failed to maintain that progress. Father produced positive drug screens and failed to comply with intensive outpatient treatment, mental health counseling, and FICS reunification services. Father also engaged in domestic violence and continued to pursue a relationship with Mother as recently as December 2017, despite the existence of a final PFA order against him. While Father made a last-minute attempt to comply with services by resuming his intensive outpatient treatment program, his efforts were simply too little, too late. Child entered foster care in December 2016, the month after she was born, and has remained there ever since. Because it is clear that Father will not remedy his parental incapacity and resume caring for Child at any point in the foreseeable future, we conclude that the court did not abuse its discretion.[6]

---

[6] While Father contends that he has shared custody of his three other children, which proves that he can care for Child, that argument is meritless. The record contains little if any evidence concerning the extent and quality of the care that Father provides his other children. Even assuming that Father does

We next consider whether the trial court abused its discretion pursuant to Section 2511(b). The requisite analysis is as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

The trial court found that Father's visits with Child go well but concluded that Father and Child do not share a bond. Trial Court Opinion, 3/7/18, at 22-23. To the extent Father and Child do share a bond, the court found that their

---

provide appropriate care, "evidence concerning a parent's ability to care for another child is irrelevant and inadmissible in a proceeding to terminate parental rights with regard to the child at issue." *A.L.D.*, 797 A.2d at 338.

bond is not strong, because Child has never lived with Father, and spent only a limited amount of time with him during supervised visits. *Id.* The court found that Child shares a bond with her pre-adoptive foster parents, with whom she has lived since December 2016. *Id.* at 23.

Father contends that the trial court disregarded evidence demonstrating that he and Child do share a bond. Father's Brief at 16. Father takes issue with the court's conclusion that no bond exists due to the limited amount of time that he and Child have spent together, calling it contrary to natural law. *Id.* at 17. He insists that a necessary and beneficial bond forms the moment a parent first sees his or her child. *See id.* at 17-18 ("Upon seeing their child, a bond is created between the parent and that child").

We again discern no abuse of discretion by the trial court. As Father argues, it was undisputed during the termination hearing that his visits with Child go well. CYF casework supervisor, Scott Brumbaugh, testified that he observed Father being "very nurturing" toward Child and that Child "does go to [Father]." N.T., 1/23/18, at 18. FICS employee, Valerie Reynolds, testified that Child appears to love Father and "they definitely have a connection." *Id.* at 26-27.

However, as discussed above, Child was born in November 2016 and entered foster care in December 2016. By the time of the hearing on January 23, 2018, Child was just over a year old. Child had spent nearly her entire life in foster care, and her only consistent experience withFather had been

supervised visits.[7]   Under the circumstances, it was reasonable for the trial court to conclude that Father and Child do not share a necessary and beneficial bond.   **See In re K.Z.S.**, 946 A.2d 753, 764 (Pa. Super. 2008) (observing that the relationship between K.Z.S. and his mother "must be fairly attenuated," given that K.Z.S. had been in foster care most of his young life, and that he had only limited contact with his mother during that time).[8]

We also reject Father's suggestion that he formed a bond with Child the moment he first saw her.  Our case law is clear that it takes more than mere biology to form a bond worthy of preservation pursuant to Section 2511(b). As this Court has emphasized, "a child develops a meaningful bond with a caretaker when the caretaker provides stability, safety, and security regularly and consistently to the child over an extended period of time."  **Matter of Adoption of M.A.B.**, 166 A.3d 434, 449 (Pa. Super. 2017).  In the instant case, Child's pre-adoptive foster parents have been her primary source of

---

[7] The record does not support the trial court's finding that Father never lived with Child.  Father, Mother, and Child lived together at least briefly prior to the court's order granting emergency custody.  **See** Order of Adjudication and Disposition, 12/28/16, at 4 ("At the time of the alleged incident . . . [Father] and [Mother] resided together.").

[8] As part of his argument with respect to Section 2511(a), Father contends that CYF limited his visitation unfairly based on Mother's lack of progress, and that the trial court then used his limited visitation as an excuse to terminate his parental rights.  Father's Brief at 11-12.  Father bases his argument on CYF's decision to limit his visitation to three hours rather than four hours at a time.  **Id.**  Because we see no reason to believe that Father and Child would have formed a significant bond if only Father's visits had been one hour longer, this claim is meritless.

stability, safety, and security throughout her life. Thus, the record supports the trial court's finding that Child shares a significant bond with her foster parents, and that terminating Father's parental rights would best serve Child's needs and welfare by allowing her to achieve permanence through adoption into their family.[9]

Based on the foregoing, we conclude that the trial court did not abuse its discretion by terminating Father's parental rights involuntarily. Therefore, we affirm the court's January 24, 2018 decree.

Decree affirmed.

---

[9] We note that Dr. O'Hara's testimony during the permanency review hearing on October 31, 2017, supports this conclusion.

> Well I think there is some limitation of me responding to this as I have no[t] been able to observe either party with [Child] since March of 2017. There have been reports from FICS' perspective that overall both parties do well with [Child]. It would be my opinion that yes there would be some detriment if termination were ever to occur. I think based on the parents['] interactions with their daughter that there would be some potential detriment for [Child] here. On the other hand, it is my opinion at this point that there are so many ongoing pervasive significant concerns that the concerns from my perspective and the risk factors for [Child] if she were to be placed with her parents these concerns would outweigh any potential detriment.

N.T., 10/31/17, at 13-14.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/18/2018